# Exhibit B

Michael A. Burke, Esq. (NSB #11527)
ROBISON, SHARP, SULLIVAN & BRUST
71 Washington St.
Reno, NV 89503
Telephone: (775) 329-3151
Email: mburke@rssblaw.com

Michael DeVincenzo, Esq. (*pro hac vice*)
Charles Wizenfeld, Esq. (*pro hac vice*)
Andrea Pacelli, Esq. (*pro hac vice*)
KING & WOOD MALLESONS LLP
500 Fifth Ave., 50th Floor
New York, New York 10110
Telephone: (212) 319-4755
Email: michael.devincenzo@us.kwm.com
andrea.pacelli@us.kwm.com
charles.wizenfeld@us.kwm.com

Steven C. Sereboff, Esq. (*pro hac vice*)
SoCAL IP LAW GROUP LLP
1332 Anacapa, Suite 120
Santa Barbara, CA 93101
Telephone: (805) 230-1356
Email: ssereboff@socalip.com

*Attorneys for Plaintiff*
*Applications in Internet Time, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| APPLICATIONS IN INTERNET TIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SALESFORCE, INC.,<br><br>Defendant. | Civil Action No.: 3:13-CV-00628-RCJ-CLB<br><br>**DECLARATION OF BEVERLY G. NELSON** |

4/25/2025

I, Beverly G. Nelson, declare and state that:

1. I make this declaration in support of Plaintiff Applications in Internet Time, LLC's ("AIT") Motion for Relief from and to Reconsider the Court's Dismissal Without Prejudice Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction.

2. I have personal knowledge of the facts stated herein. I could and would competently testify as to these facts if called upon to do so.

3. In early 2022, I fell seriously ill due to a COVID-19 infection. At the time I was already in my eighties, and the effects of COVID-19 were severe and prolonged. In view of my compromised physical condition, my doctor advised against me testifying unless or until my condition improved. I hope the Court understands that I desired to testify in 2022 and would have testified had I been able to do so. I am now able to testify, and I hope the Court will consider my testimony given the Court's finding that contrary to my knowledge and intent, I myself own the patents asserted in this litigation and not AIT.

4. I have been working as a software industry executive since the 1980s. In 1986, Douglas Sturgeon, my son Anthony Sziklai, and I founded Alternative Systems, Inc. ("ASI"), a software consulting company. I was the Chief Executive Officer (CEO) of ASI and Mr. Sturgeon was its President and Chief Operating Officer (COO).

5. In addition to being ASI's CEO, I was also its majority shareholder, with ownership of 51% of stock in ASI.

6. ASI commercialized a software product called "Tinia" which was initially released in 1988. Tinia was an Environmental Health and Safety (EH&S) information management system targeted at large industrial customers.

7. In June 1997, ASI entered into a joint venture with Levine-Fricke-Recon Group, Inc. ("LFRG") and formed a new entity called LFR Technologies, LLC ("LFRT") in order to develop the next generation of Tinia software.

8. As part of the establishment of LFRT in 1997, many of ASI's employees became employees of LFRT. I stepped down from my position as CEO of ASI and became CEO of LFRT. Although I stepped down as CEO, I retained my majority ownership interest in ASI at all times.



4/25/2025

9. In December 1998, ASI filed a patent application on a new generation of Tinia. Six of the inventors were employees of LFRT, and LFRT had the inventors assign their rights to the patent applications to ASI, including any future patents that may issue therefrom. LFRT paid all expenses for the prosecution of those patent applications, and also for the assignment of the patent applications to ASI. The assignment was handled by LFRT's in-house counsel Jeffrey Gananian. We called this software platform "VerticalSuite," and the patent application referred to the technology as "Integrated Change Management Unit," or "ICMU." Two of the ICMU patents that eventually issued from that original patent application are asserted in this litigation (U.S. Patent Nos. 7,356,482 and 8,484,111, the "Patents-in-Suit").

10. Around 2002, LFRG decided to exit the joint venture with ASI. On April 24, 2002, ASI, LFRT, and various other entities entered into a "Letter Agreement," attached hereto as Exhibit A. I executed the 2002 Letter Agreement on behalf of LFRT.

11. In February 2005, Mr. Sturgeon and I formed AIT as a Nevada limited liability company. The original members of AIT were Mr. Sturgeon, his father, and myself. By 2012, Mr. Sturgeon and I became the only members of AIT. I owned at that time a 45% interest in AIT. After Mr. Sturgeon's father passed in 2011, my interest in AIT increased to 49%.

12. In November 2006, the parties to the 2002 Letter Agreement entered into an "Agreement for Sale," attached hereto as Exhibit B, whereby the 2002 Letter Agreement was sold to me. I did not intend for the 2006 Agreement at the time to assign all rights in any patents or patent applications to me as an individual. Following execution of the 2006 Agreement I intended to have the rights to the ICMU patents and patent application remain with ASI. I agree to any reformation of the contract that is consistent with that intent.

13. In 2006, I was still a majority owner of ASI, and I intended the 2006 Agreement to allow all ASI assets, including the patents and patent applications, to remain with ASI. Mr. Sturgeon and I were continuing to try and monetize the technology disclosed in the Patents-in-Suit. Personally acquiring ownership of the patents was not considered by me and was not my intent. Conversely, I believed acquiring all rights under the 2002 Letter Agreement allowed me to simply leave the ASI assets with ASI, a company I controlled based on my ownership interest.

4/25/2025

14. For several years after 2006, Mr. Sturgeon and I explored ways to monetize the ASI intellectual property assets, including bringing software products to market. Due to market conditions, those efforts did not come to fruition. In November 2011, as we were celebrating Thanksgiving at our home, Mr. Sturgeon and my son Anthony Sziklai discovered that Salesforce likely infringed ASI's ICMU patents. Thereafter, Mr. Sturgeon and I discussed using AIT as the vehicle for monetizing the ICMU patents through litigation. We further discussed and agreed that the ICMU patents would be assigned to AIT so that AIT could then assert an action against Salesforce.

15. As the managing member of AIT, consistent with both our desires, Mr. Sturgeon was tasked with executing the assignments ensuring that the Patents-in-Suit would be owned by AIT and that AIT could assert such patents. On September 13, 2012, a few months before litigation counsel was retained, ASI represented that it owned all rights to the ICMU patents and assigned all such rights to AIT, which was an entity entirely controlled by Mr. Sturgeon and myself. Mr. Sturgeon executed that assignment, attached hereto as Exhibit C, on behalf of ASI, granting all right, title and interest to AIT, and such assignment was entered with my knowledge and approval. I fully intended for AIT to own all rights to the ICMU patents as part of our monetization efforts via litigation against Salesforce.

16. Since 2012, AIT has had only two members, Mr. Sturgeon and myself. As the managing member of AIT, Mr. Sturgeon runs the affairs of the company and I do not participate in the management of the litigation. However, Mr. Sturgeon and I are in regular communication regarding the business of AIT and I am informed of all material decisions of the company. This has included the assignment of the ICMU patents from ASI to AIT in 2012, and the subsequent decision to initiate this litigation in 2013.

17. In addition to having been business partners for decades, Mr. Sturgeon and I are personally close and have been living together since 1989. In fact, the business of AIT has been primarily conducted from our common home since 2011. Mr. Sturgeon and I are the only members of AIT and there has never been a dispute with respect to how the rights in the Patents-in-Suit should be owned or transferred. I hope the Court understands that given the relationship between AIT, ASI, Mr. Sturgeon and myself in 2012, our decisions and discussions were not formally set forth in e-mails with agendas, but typically took place as we performed parts of our everyday routine, during meals, running



4/25/2025

errands or driving, etc. However, I have been aware of the business decisions of AIT since AIT was founded in 2005 and a large part of the business for the last decade has been this litigation. Similarly, I was the majority owner of ASI during all relevant times and I was closely involved with its business decisions.

18. When Mr. Sturgeon and I decided that the Patents-in-Suit should be transferred to AIT for purposes of litigation, Mr. Sturgeon, as managing member, was tasked with effectuating the assignment of all rights, title and interest in the Patents-in-Suit to AIT. I understood at the time and believed I gave up any rights I may have had regarding the Patents-in-Suit when ASI transferred the Patents-in-Suit to AIT.

19. I have ridden the ups and downs of this litigation for the past decade and have never claimed an ownership interest in the Patents-in-Suit nor believed I had any interest in the Patents-in-Suit apart from my ownership interest in AIT. I did not, in my individual capacity or as the majority owner of ASI, consider the 2006 Agreement to effectuate an ownership transfer of the Patents-in-Suit to myself from ASI.

20. I understand the Court found that I am the owner of the Patents-in-Suit. I can firmly attest that it was never my intent to own the Patents-in-Suit. Instead, in both my individual and ownership capacity, I, ASI and AIT all intended AIT to own all right, title and interest to the Patents-in-Suit by virtue of the 2012 Assignment.

21. I understand the Court found Mr. Sturgeon either should have executed the 2012 assignment to AIT on behalf of myself or, alternatively, I should have executed that assignment personally. However, Mr. Sturgeon did not transfer the Patents-in-Suit to AIT without my knowledge and approval. As detailed above, the purpose of the transfer was so that AIT, a company we jointly owned, could monetize the patents after we became aware of Salesforce's infringement.

22. I confirm that Mr. Sturgeon had the authority to execute the 2012 Assignment. Indeed, had I believed I needed to execute the assignment or provide written authorization for Mr. Sturgeon to execute the 2012 Assignment on my behalf, I would have executed such document or provided such written authorization at the time.

4/25/2025

23. I hereby confirm, authorize and ratify the 2012 Assignment, attached hereto as Exhibit C, in my individual capacity as well as in my capacity as the majority owner of ASI. I agreed to the 2012 Assignment of all rights in the ICMU patents at the time the 2012 Assignment was executed. By agreeing to the transfer of all rights in the ICMU patents from ASI to AIT, I understood, as an individual, as the majority owner of ASI, and as one of two members of AIT, that I had no rights to, or regarding, the ICMU Patents following that transfer. I formally acknowledge that by agreeing to the 2012 Assignment I did discard and have discarded any right with respect to the ICMU Patents given me under the 2006 Agreement.

24. AIT has proceeded in this action with my knowledge and consent since the filing of the Complaint on November 8, 2013. I further have and hereby ratify AIT's actions in this litigation. To be clear, I authorize and have authorized AIT's actions in this litigation and I further have authorized and authorize AIT to continue this action and agree to be bound by this lawsuit's results.

25. Attached hereto as Exhibit D is a quitclaim assignment of the ICMU Patents, including the Patents-in-Suit, to AIT, that I executed on today's date.

I declare under penalty of perjury under the laws of the United States of America that each of the foregoing statements is true and correct.

Executed on April 25th, 2025 in Half Moon Bay, California,

Beverly G. Nelson

4/25/2025