# Exhibit D

Michael A. Burke, Esq. (NSB #11527)
ROBISON, SHARP, SULLIVAN & BRUST
71 Washington St.
Reno, NV 89503
Telephone: (775) 329-3151
Email: mburke@rssblaw.com

Mark S. Raskin, Esq. (*pro hac vice*)
Michael DeVincenzo, Esq. (*pro hac vice*)
Charles Wizenfeld, Esq. (*pro hac vice*)
Andrea Pacelli, Esq. (*pro hac vice*)
Daniel Miller, Esq. (*pro hac vice)*
KING & WOOD MALLESONS LLP
500 Fifth Ave., 50th Floor
New York, New York 10110
Telephone: (212) 319-4755
Email: michael.devincenzo@us.kwm.com
andrea.pacelli@us.kwm.com
charles.wizenfeld@us.kwm.com
mark.raskin@us.kwm.com
daniel.miller@us,kwm.com

Steven C. Sereboff, Esq. (*pro hac vice*)
SoCAL IP LAW GROUP LLP
1332 Anacapa, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 230-1356
Email: ssereboff@socalip.com

*Attorneys for Plaintiff*
*Applications in Internet Time, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| APPLICATIONS IN INTERNET TIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SALESFORCE, INC.,<br><br>Defendant. | Civil Action No.: 3:13-CV-00628-RCJ-CLB<br><br>**DECLARATION OF DOUGLAS H. STURGEON IN SUPPORT OF PLAINTIFF APPLICATIONS IN INTERNET TIME, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION** |

**FILED UNDER SEAL**

I, Douglas H. Sturgeon, hereby declare:

1. I make this Declaration in support of Plaintiff Applications in Internet Time, LLC's ("AIT") opposition to Defendant Salesforce, Inc.'s ("Salesforce") motion to dismiss. The facts set forth below are known to me personally and I have firsthand knowledge of them.

2. I have been working in the software industry since the early 1980's. In 1986, Beverly Nelson, her son Anthony Sziklai, and myself founded Alternative Systems, Inc. ("ASI"), a software consulting company. Ms. Nelson was the Chief Executive Officer (CEO) of ASI and I was its President and Chief Operating Officer (COO).

3. In addition to being ASI's CEO, Ms. Nelson was also a majority shareholder, with ownership of 51% of stock in the company. In fact, as a Women-owned Business Enterprise (WBE), ASI was able to obtain a preference when pursing contracts with U.S. government agencies.

4. ASI commercialized a software product called "TINIA" (also spelled as "Tinia") which was initially released in 1988. Tinia was an Environmental Health and Safety (EH&S) information management system targeted at large industrial customers.

5. Through the 1980s and 1990s ASI released multiple versions of Tinia, through version 3.0. Versions 1.0 and 2.0 of Tinia were written in the Speed II programming language and ran exclusively on the Wang hardware platform. In 1990–91, ASI re-engineered Tinia to work with the Oracle relational database environment, resulting in Version 3.0 of Tinia. As was typical for business software in that time frame, Tinia was character-based and did not have a graphical user interface (GUI).

6. In June 1997, ASI entered into a joint venture with Levine-Fricke-Recon Group, Inc. ("LFRG") and formed new entity called LFR Technologies, LLC ("LFRT") to develop the next generation of Tinia software (generally referred to in the agreement as "Tinia v.4.0" even though that terminology was later abandoned). In the joint venture, ASI provided the software technology and LFRG contributed funding. It was agreed that all of the intellectual property resulting from the software development effort would be owned by ASI, and not by LFRT or LFRG.

7. As part of the establishment of LFRT in 1997, many of ASI's employees became employees of LFRT. Ms. Nelson stepped down from her position as CEO of ASI and became CEO of LFRT. I remained employed by ASI as its President and COO. I was never employed by LFRT.

8. Two of the main enhancements that ASI and LFRG intended for the next generation of Tinia were web-enablement (i.e., making the software able to operate in a web environment) and being able to rapidly identify changes made to one function of the software application and the impact those changes would have on the rest of the software application. As part of web-enablement, the next generation of Tinia would also have a GUI.

9. In an effort to provide web-enablement, LFRT first rewrote the Tinia software in the Java programming language, which was relatively new at the time. That effort was not successful due to the limitations of Sun Microsystems' Java software development toolkit. LFRT also implemented a GUI for Tinia using Oracle Forms 4.5, but that effort was abandoned due to the limitations of the Oracle Forms platform. Eventually, LFRT decided to develop its own application development environment. After significant effort in the early 1998 timeframe, LFRT developed a prototype environment that could run in a web environment and could track changes in the end-user application. LFRT initially labeled this prototype "Tinia v4.5," but that terminology was also abandoned later.

10. LFRT migrated the Tinia software application to the new environment, later known as "VerticalSuite," by exporting the data model from Tinia 3.0 and then importing the exported data model into the VerticalSuite environment. Once the data model was in place, the resulting application data entry forms and reports and other background processes could be quickly re-created using the point-and-click designer facility of the VerticalSuite environment. After migration, the former Tinia software application was fully web-enabled and any changes to the migrated application could be tracked using the facilities of the VerticalSuite designer resource/environment. Therefore, the improved software system that ultimately replaced Tinia was a combination of the VerticalSuite platform and application metadata for the equivalent application, which was rebranded as "GreenSuite." Because GreenSuite/VerticalSuite was a superior substitute for previous versions of Tinia, LFRT discontinued Tinia in favor of GreenSuite. As such, GreenSuite/VerticalSuite was a competing product of Tinia within the product line.

11. In December 1998, ASI filed a patent application for the software technology underlying the VerticalSuite software platform. In the patent application we called this technology Integrated Change Management Unit (ICMU). Two of the ICMU patents that eventually issued from that original patent application (U.S. Patent Nos. 7,356,482 and 8,484,111) are asserted in this litigation.

12. Each of the inventors on the ICMU patents, including those who were employees of LFRT, executed an assignment of the invention to ASI. LFRT management was aware of that assignment. Under the agreement with ASI, LFRT paid for all expenses associated with patent prosecution. I even recall discussions between ASI and LFRT management regarding the patent prosecution budget which LFRT was responsible for. In fact, LFRT paid for the preparation of the assignments from the inventors to ASI. LFRT would not have agreed to pay those costs with ASI being the assignee, if that was inconsistent with their understanding of the agreement.

13. Around 2002, LFRG decided to exit the joint venture with ASI. On April 24, 2002, ASI, LFRT, and various other entities entered into a "Letter Agreement" which involved the formation of new entities and the transfer of various assets and debt to those entities, including the ICMU patents. However, the parties later decided not to act on that plan. ASI did not transfer the ICMU patents under that agreement, and following that agreement, the ICMU patents remained with ASI.

14. In February 2005, Ms. Nelson and I formed AIT as a Nevada limited liability company. The original members of AIT were Ms. Nelson, my father, and myself. After my father passed away in 2011, Ms. Nelson and myself became the only members of AIT.

15. In November 2006, the parties to the 2002 Letter Agreement entered into an "Agreement for Sale" whereby all rights under the Letter Agreement were sold to Ms. Nelson. I understand this today, and understood it at the time, to refer to the contractual rights under the Letter Agreement. I did not understand the Agreement for Sale at the time, and I do not understand it today, to reflect an assignment of the ICMU patents to Ms. Nelson.

16. During my deposition I was asked about the November 2006 Agreement for Sale. I testified that agreement sold "everything" to Ms. Nelson. I did not intend to suggest that the November 2006 Agreement for Sale effected an assignment of the ICMU patents to Ms. Nelson. Instead, I meant

that all contractual rights granted under the 2002 Letter Agreement were transferred to Ms. Nelson. At the time, it had not occurred to me that anyone would interpret the November 2006 Agreement for Sale as a transfer of ASI's Assets to Ms. Nelson. I explained earlier at my deposition, consistent with this declaration, that ASI remained the owner of the of all right, title and interest to the ICMU patents until those patents were assigned to AIT.

17. In 2012, ASI assigned the ICMU patents to AIT, which at that point was an entity entirely controlled by Ms. Nelson and myself. I executed that assignment. The aim of AIT was to monetize the ICMU patents.

18. Since 2012 AIT has had only two members, Ms. Nelson and myself. As the managing member of AIT, I run the affairs of the company. However, Ms. Nelson and I are in constant communication regarding the business of AIT and she is informed of all material decisions of the company. This has included the assignment of the ICMU patents from ASI to AIT and the subsequent decision to initiate this litigation.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 28, 2022 in Half Moon Bay, CA.

Douglas H. Sturgeon